IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TINA M. NELSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security | : | |
| Administration | : | NO.  08-4785 |

## REPORT AND RECOMMENDATION

THOMAS J. RUETER                                    May 28, 2009
Chief United States Magistrate Judge

       Plaintiff, Tina M. Nelson, filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for disability benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act").

       Plaintiff filed a Brief and Statement of Issues in Support of Request for Review ("Pl.'s Br."). Defendant filed a Response to Request for Review of Plaintiff ("Def.'s Br.") and plaintiff filed a Reply Brief ("Pl.'s Rep."). For the reasons set forth below, this court recommends that plaintiff's Request for Review be GRANTED and the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      FACTUAL AND PROCEDURAL HISTORY

       Plaintiff was born on February 17, 1974. (R. 42-47.) She completed the eleventh grade and was preparing for her GED. (R. 56, 671.) She had past relevant work experience as a fast food worker, telephone solicitor and factory worker. (R. 671-72.) Plaintiff filed an

application for social security benefits on March 28, 2005, alleging disability since December 15, 2002, due to psychological problems, asthma, blood clots, back problems, arthritis, and acid reflux.  (R. 42-44, 50.)  Plaintiff's claim was denied and she subsequently filed a request for a hearing before an administrative law judge ("ALJ").  A hearing was held on November 20, 2006 before ALJ Daniel L. Rubini.  (R. 626-85.)  In his decision of January 20, 2007, the ALJ found that plaintiff was not disabled.  (R. 12-25.)  The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2004.

2.    The claimant has not engaged in substantial gainful activity since December 15, 2002, the alleged onset date (20 CFR 404.1520(b), 20 CFR 404.1571, *et seq*., 20 CFR 416.920(b) and 20 CFR 416.971, *et seq*.).

3.    The claimant has the following severe impairments: lumbar degenerative disc disease, depression, asthma, and obesity (20 CFR 404.1520(c) and 20 CFR 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 20 CFR 404.1525, 20 CFR 404.1526, 20 CFR 416.920(d), 20 CFR 416.925 and 20 CFR 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work (light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds; or very little lifting, but a good deal of walking or standing; or sitting most of the time, with some pushing and pulling of arm and leg controls), which allows alternating sitting and standing, as needed; and which does not involve significant exposure to fumes, odors, dust, and poor ventilation; and which would not involve complex or detailed instructions, and which would involve limited dealing with the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 20 CFR 416.965).

2

7.    The claimant was born on February 17, 1974 and is considered to be a younger individual age 18-44 (20 CFR 404.1563 and 20 CFR 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 20 CFR 416.964).

9.    Transferability of job skills is not material in this case, in light of her age, education, and work experience (20 CFR 404.1568 and 20 CFR 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 20 CFR 404.1566, 20 CFR 416.960(c) and 20 CFR 416.966).

11.    The claimant has not been under a "disability" as defined in the Social Security Act, from July 30, 2004 through the date of this decision (20 CFR 404.1520(g) and 20 CFR 416.920(g)).

(R. 12-25.)

Plaintiff requested that the Appeals Council review the decision of the ALJ.  (R. 11.)  This request for review was denied on August 6, 2008.  (R. 6-9.)  The ALJ's decision became the final decision of the Commissioner.  Plaintiff now seeks judicial review of the decision of the ALJ pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The role of this court on judicial review is to determine whether there is substantial evidence in the record to support the Commissioner's decision.  Jesurum v. Sec'y of United States Dep't of Health and Human Serv., 48 F.3d 114, 117 (3d Cir. 1995).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate."  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence.  Jesurum, 48 F.3d at 117.  This court may not weigh evidence or

substitute its conclusions for those of the fact-finder.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993)).  As the Third Circuit stated, "so long as an agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse . . . those findings."  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).

To be eligible for benefits, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  Specifically, the impairments must be such that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Under the Act, the claimant has the burden of proving the existence of a disability and must furnish medical evidence indicating the severity of the impairment.  42 U.S.C. § 423(d)(5).  A claimant satisfies this burden by showing an inability to return to former work. Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979).  Once this standard is met, the burden of proof shifts to the Commissioner to show that given the claimant's age, education, and work experience the claimant has the ability to perform specific jobs that exist in the national economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f).

The Commissioner decided this matter by utilizing the five step sequential evaluation process established by the Department of Health and Human Services to determine

4

whether a person is "disabled." This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of her age, education, and work experience.  20 C.F.R. §§ 404.1520, 416.920.

## III.    BACKGROUND

### A.    Testimony of Plaintiff, November 20, 2006

Plaintiff testified that she was thirty-two years old, sixty-six inches tall, and weighed 362 pounds at the time of the hearing.  (R. 630-31.)  Plaintiff lived with a family friend.  (R. 630.)  She was married but lived apart from her husband due to physical and mental abuse.  (R. 631.)  Plaintiff last worked as an "appointment setter" but left that job after two weeks because she experienced back problems which interfered with her job performance.  (R. 632-33.)  Plaintiff also has been employed as a factory worker, supermarket cashier, telephone solicitor, fast food worker and gas station attendant.[1]  (R. 634.)

Plaintiff moved to Erie, Pennsylvania to live in a women's shelter.  While living in Erie, she was hospitalized due to problems with her medication.  (R. 642.)  She also spent some time in a rehabilitation facility to receive treatment for an alcohol problem.  She last drank alcohol in December 2004; she stopped using drugs prior to that time.  (R. 643.)

With respect to her physical impairments, plaintiff testified that her back problems

---

[1]    Plaintiff injured her ankle at the factory and never returned to work after the injury.  She left the supermarket position due to back problems and difficulty standing for the required period.  She was laid off from the telephone solicitor job.  She left the fast food position when she was hospitalized for a blood clot in her lungs.  She quit the gas station attendant job due her fear of being injured in robberies which had been occurring at the station.  (R. 634-39.)

were "getting worse, and my arthritis is not helping any.  And it's harder for me to get

comfortable sitting, or standing, or sleeping.  I can't even sleep right at night.  I'm up half the

night."  (R. 645.)  The pain radiated from her back into her legs.  She had numbness, tingling and

weakness in her legs.  (R. 662.)  She took Tylenol with codeine and Neurontin to treat this pain.[2]

(R. 645-46.)  Plaintiff discussed back surgery with a surgeon.  According to plaintiff, the surgeon

"didn't want all the high risk and stuff because of my weight and other things, that he didn't want

to take the risk of trying surgery; that he wanted me to go to Pain Management to get injections

in my back."  (R. 646.)  Plaintiff had three injections which provided some pain relief.  However,

each time she received an injection, she had to discontinue her Coumadin.  This disrupted her

blood levels and put her at an increased risk for blood clots.  Id.  Plaintiff indicated that her

arthritis pain also had increased because the arthritis spread throughout her body.  (R. 647.)  She

used a cane for approximately one and one-half years.[3]  (R. 647-48.)

Plaintiff explained that she began to receive mental health treatment as a child.[4]

(R. 648.)  At the time of the hearing, plaintiff received treatment for severe depression, anxiety

disorder, bipolar disorder, mood swings and sleep problems.  (R. 649.)  Plaintiff described her

depression as follows:

---

[2]     She used a nebulizer and inhalers to treat her asthma.  She also took Singulair and used nasal sprays.  (R. 662-63.)  She was prescribed Ativan, Effexor and Lamictal to treat her bipolar disorder and mood swings.  Id.  She took water pills and Coumadin.  She was prescribed Imitrex to treat her migraines.  (R. 663.)

[3]     According to plaintiff, the cane was prescribed by a doctor at the Lehigh Valley Physicians Practice.  (R. 648.)

[4]     She had issues due to her weight and was picked on by other children.  (R. 648-49.)

> Even being on medicine, medicine is not a quick fix; and being severely
> depressed, it keeps you from being in contact with the outside world.  You isolate.
> You don't want to be around anybody.  It's - - you want to stay in bed all day, and
> not be a part of the community . . .  sometimes, it even makes me feel like I don't
> even know why I am here.

(R. 650.)  Plaintiff also had anger management issues; she lost her temper easily.  She was

arrested for disorderly conduct after being threatened by a woman in the Erie program.  She also

was cited for disorderly conduct at a family function.  (R. 654-55.)  Plaintiff had difficulty

controlling her emotions and frequently experienced crying spells.  (R. 656.)  Plaintiff had

difficulty maintaining her personal hygiene.  Her bathroom facilities were small which created

problems for her.  In addition, pain impeded her ability to wash her hair.  (R. 657.)

    During a typical day, plaintiff attended doctors' appointments.  She also

participated in a program for the mentally ill at the Clubhouse of Lehigh County.[5]  Id.  She tried

to attend at least three days a week, from 9:00 a.m. to 2:00 p.m.  She was able to work at her own

pace at the various activities offered at the club.[6]  (R. 658-61.)  She was unable to clean or do

laundry.  On occasion, she went to the grocery store accompanied by a friend.  (R. 658.)  Plaintiff

enjoyed reading and watching movies.  She did not attend church.  She occasionally shopped at

the mall.  (R. 669-70.)  Plaintiff did not have a computer, and she experienced difficulty using

one at a previous job since she did not know how to type.  (R. 670-71.)

    Plaintiff was advised by her physician to lose weight and also was instructed to

---

[5]    The record reveals that the Clubhouse is a program associated with Good
Shepherd Rehabilitation whose "vision . . . is to offer persons with mental illness a safe healing
environment wherein each person is given the opportunity to explore their personal and
vocational potentials to their fullest and receive support in achieving there goals."  (R. 577.)

[6]    Plaintiff took public transportation to her appointments and to the Clubhouse.  (R.
667.)  She never had a driver's license and never drove a car.  (R. 669.)

make an appointment with a bariatric specialist.  (R. 652.)  Her physician gave this advice prior

to the hearing, but the treatment was postponed due to other physical problems plaintiff had

experienced.  (R. 652-53.)  Plaintiff explained that were risks associated with bariatric surgery,

since she would be required to discontinue her blood thinners before surgery.  (R. 653.)  Plaintiff

was unable to exercise as part of a weight loss plan.  Id.

> **B.**     **Testimony of Vocational Expert, Leigh Levin, November 20, 2006**

> The ALJ posed the following hypothetical to the VE:

>> All right, look at a work environment where she would not have to carry out
>> complex or detailed instructions; and for the moment, let's limit that to simple,
>> routine, repetitive type work, although it could be more than one step; and that she
>> would not have to deal with the public.  Also, limit fumes, odors, dust, and poor
>> ventilation; and limit to a light exertional environment.  Are there any examples of
>> such jobs with those limitations?

(R. 672.)  The VE identified the following jobs: garment folder, garment sorter, and small

product assembler.  (R. 672-73.)  The VE added that those positions can be performed either

sitting or standing.  (R. 673.)  When asked about sedentary positions the hypothetical individual

could perform, the VE explained that the positions would be the same, but the number of jobs

would be reduced by approximately fifty percent.  The numbers also would be reduced for

sedentary positions with a sit/stand option.  (R. 674.)

> In response to questioning by plaintiff's counsel, the VE opined that an individual

who needed to take unscheduled breaks during the day would be unable to perform the tasks

associated with the identified positions.  (R. 675.)  The VE related that if the mental limitations

set forth in the mental health source statement prepared by plaintiff's therapist were credited,

plaintiff's ability to perform sustained work would be impacted.  (R. 675-76.)  The VE opined

that an individual with moderate limitations on his ability to maintain attention and concentration would still be able to perform unskilled work.  (R. 676.)  The VE agreed that the ability to understand and remember very short and simple instructions is critical to the performance of unskilled work.  The VE reported that the ability to perform activities within a schedule, maintain attendance and be punctual is critical to performing unskilled work.  (R. 677.)  He added that the ability to work in coordination or in proximity to others without distraction is not as significant if the individual was working independently and not on a team.  (R. 678-79.)  According to the VE, it  would be important for the individual to maintain socially appropriate behavior in order to successfully perform unskilled work.  (R. 679.)

> Plaintiff's counsel posed the following question to the VE:
>
> Would- - if, if GAF scores exist over a period of three years with no score - - with all scores at or below a level of 50, would you attach significant vocational significance to, to such assessment?

(R. 680.)  The VE responded that if the GAF scores were supported by the notes accompanying the scores, an individual with the scores noted in the hypothetical question would be unable to sustain full-time employment.[7]  Id.  The VE opined that an individual who needed to lie down at work during the day would be unable to work on a full-time basis.  An individual who only was able to sit for a maximum of thirty minutes and stand for a maximum of fifteen minutes would not be able to perform full-time work.  (R. 681-82.)

## IV.    DISCUSSION

The ALJ found that the evidence of record supports a finding that plaintiff was not

---

[7]    The Global Assessment of Functioning scale ranges from zero to one hundred and is used to assess an individual's psychological, social and occupational function.  *Diagnostic and Statistical Manual of Mental Disorders IV* ("*DSM-IV*") 32 (4th ed. 2000).

disabled.  (R. 12-25.)  Plaintiff contests this finding and contends that substantial evidence does

not support the ALJ's decision.  Specifically, plaintiff argues that: (1) the ALJ failed to provide

adequate reasons for ignoring or discounting medical evidence regarding plaintiff's physical and

psychological impairments and treatment providers; (2) the ALJ failed to take proper account of

plaintiff's obesity; and (3) the ALJ's credibility assessment is not supported by substantial

evidence.  (Pl.'s Br. at 5-30.)

### A.    ALJ's Evaluation of Medical Evidence

Plaintiff argues that the ALJ failed to properly analyze all relevant evidence in the

record.  (Pl.'s Br. at 5-20; Pl.'s Rep. at 1-3.)  With respect to her mental health treatment,

plaintiff contends, inter alia, that the ALJ failed to consider multiple GAF scores in the record.

(Pl.'s Br. at 15-17; Pl.'s Rep. at 1-3.)  In Colon v. Barnhart, 424 F. Supp. 2d 805, 812 (E.D. Pa.

2006), the court explained that GAF scores constitute medical evidence which must be addressed

by an ALJ.  The court reasoned as follows:

> Pursuant to final rules of the Social Security Administration, a claimant's GAF
> score is not considered to have a "direct correlation to the severity requirements."
> However, the rules still note that the GAF remains the scale used by mental health
> professionals to "assess current treatment needs and provide a prognosis."  As
> such, it constitutes medical evidence accepted and relied upon by a medical source
> and must be addressed by an ALJ in making a determination regarding a
> claimant's disability.  Although the ALJ "may properly accept some parts of the
> medical evidence and reject other parts . . .  he must consider all the evidence and
> give some reason for discounting the evidence he rejects."  Adorno v. Shalala, 40
> F.3d 43, 48 (3d Cir. 1994).

As plaintiff correctly notes, the record contains multiple GAF scores of fifty or

below.[8]  A November 2003 psychiatric evaluation signed by Sean Su, M.D., noted that plaintiff

---

[8]       A GAF score between forty-one and fifty indicates "serious symptoms (e.g.
suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in

had a GAF of forty-five.[9]  (R. 197.)  A January 10, 2005 assessment by a therapist notes that

plaintiff's GAF score was forty-five.  (R. 258.)  On January 19, 2005, Edward R. Norris, M.D.,

assessed plaintiff's GAF at fifty.[10]  (R. 237.)  A March 14, 2005 GAF score of forty-eight was

assessed by L. Villaluz, M.D.  (R. 261.)  On December 14, 2005, Mary Cohen, M.D., gave

plaintiff a GAF score of fifty.  (R. 478.)  Upon admission to a partial hospitalization program in

July 2006, plaintiff was assigned a GAF score of thirty.  (R. 529.)  Upon discharge from this

facility, plaintiff's GAF was forty-five.  (R. 550.)

        Case law is clear that remand is necessary when an ALJ fails to specifically

discuss GAF scores.  See, e.g., Glover v. Astrue, 2008 WL 517229, at *1 (E.D. Pa. Feb. 27,

2008) ("Courts in the Eastern District of Pennsylvania have repeatedly noted that GAF scores

constitute medical evidence that is accepted and relied upon by physicians, and that where an

ALJ fails to explain why the scores have been discounted, a remand is necessary."); Robleto v.

Barnhart, 2006 WL 2818431, at *8 (E.D. Pa. Sept. 28, 2006) (A GAF score constitutes medical

evidence accepted and relied upon by a medical source, and must be addressed by an ALJ in

making a determination regarding a claimant's disability.); Colon, 424 F. Supp. 2d at 813-14

("[I]n light of Plaintiff's total GAF score history, the ALJ was required to discuss his reasons for

---

social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  DSM IV, at
34.

    [9]    While the ALJ discussed this report, he did not note the GAF assessment nor did
he explain the import of this score.  (R. 19.)

    [10]    While the ALJ discussed other aspects of Dr. Norris' report, the ALJ failed to note
the GAF score of fifty, or Dr. Norris' impression that plaintiff had "significant psychological
issues and social difficulties," was depressed and appeared to be at her "baseline."  (R. 19, 236-
37.)

not even considering the two GAF scores of 50, leading up to the disability determination in this case.").

In the case <u>sub judice</u>, the ALJ failed to mention the multiple GAF assessments in the record.  Furthermore, the ALJ's opinion provides no indication whether he considered these scores, or any specific reasons for discounting their significance.  Because the ALJ failed to consider this evidence, this court is unable to conclude that the ALJ's disability determination is supported by substantial evidence.  As stated above, although an ALJ may "properly accept some parts of the medical evidence and reject other parts . . . he must consider all the evidence and give some reason for discounting the evidence he rejects." <u>Adorno</u>, 40 F. 3d at 48.  Accordingly, this court recommends that this case be remanded for consideration of plaintiff's GAF scores in conjunction with the other mental health evidence in the record and their effect on her RFC.[11]

Plaintiff further argues that the ALJ failed to consider plaintiff's physical impairments and evidence that corroborates the resulting limitations.  (Pl.'s Br. at 5-20; Pl.'s

---

[11]     Plaintiff also argues that the ALJ failed to afford proper weight to the opinion of Richard Bogert, a licensed professional counselor.  (Pl.'s Br. at 20-30.)  Defendant counters that the opinion was not entitled to "controlling weight" as Mr. Bogert was not an acceptable medical source.  In her Reply Brief, plaintiff concedes that Mr. Bogert's opinion was not entitled to controlling weight.  (Pl.'s Rep. at 3-4.)  However, plaintiff maintains that this opinion should be entitled to consideration and weight as an "other" source. <u>Id.</u> at 3.  This court notes that in his decision, the ALJ set forth reasons for discounting the opinion of Mr. Bogert.  (R. 23.)  The ALJ indicated that while he did not consider Mr. Bogert "'an acceptable medical source,' as described in 20 CFR 404.1513 and 416.913," he did consider the report of Mr. Bogert pursuant to Social Security Ruling 06-3p. <u>Id.</u>  However, as noted above, the court recommends that the case be remanded to consider plaintiff's GAF scores along with the other mental health evidence of record.  Accordingly, the court further recommends that the ALJ analyze the report of Mr. Bogert in conjunction with the analysis of the GAF scores, since the report constitutes evidence from an "other source" as defined in 20 C.F.R. §§ 404.1513(d) and 416.931(d) and may explain the severity of the plaintiff's impairments and how these impairments affect plaintiff's ability to function.

Rep. at 1-3.)  Specifically, plaintiff argues that the ALJ failed to consider plaintiff's lower back

and leg pain.  (Pl.'s Br. at 17-19.)  With respect to plaintiff's back pain, the ALJ noted that a

"lumbar MRI showed a right-sided, L5-S1 disc protrusion, which was quite large, and was

compressing the S1 nerve root.  She also had degenerative disc disease at 3-4 and 4-5."  (R. 18.)

The ALJ appeared to discount this back and leg pain when he reported the following:

> The claimant has had limited, conservative treatment for back pain.  She had
> physical therapy from January until May 2005 (Exhibit B24F).  In January 2006,
> Dr. Robert Wilson recommended repeat epidural steroid injections, and stated that
> opiod drugs should be avoided, because of the claimant's history of polysubstance
> abuse (Exhibit B37F).

(R. 22.)  The ALJ also relied on the treatment records of Stefano Camici, M.D., a neurosurgeon,

when he analyzed plaintiff's back impairment.  The ALJ indicated that

> Dr. Stefano Camici, a neurosurgeon, examined the claimant in September 2005.
> The claimant reported that she had back pain with radiation into her right lower
> extremity, and that she had intermittent numbness and tingling.  She also reported
> having weakness in her right leg, and her leg would "give out."  She reported
> having increased difficulty ambulating short distances.  On examination, the
> claimant's motor strength in the lower extremities was decreased, especially on
> the right with dorsiflexion, plantar flexion and hip flexion, but Dr. Camici stated
> that he thought this was due to pain, and not weakness.  Her sensation was intact
> to pinprick, crude touch, and temperature.  Her reflexes were 2/4 and symmetric
> (Exhibit B30F).  Dr. Camici did not think that the claimant was a surgical
> candidate, and referred her for epidural steroid injections, because she had
> reported pain relief with the injections in the past.

(R. 19.)  As stated above, the ALJ concluded that plaintiff received only conservative treatment

for her back impairments.  However, as plaintiff points out in her brief, the ALJ erroneously

believed that Dr. Camici stated that plaintiff was not a surgical candidate.  (Pl.'s Br. at 18.)  In

reality, Dr. Camici reported the following:

> I did have a thorough discussion with Tina and her boyfriend in the office today
> regarding her medical condition.  Her MRI does indicate that she could benefit

13

from a right L5-S1 hemilaminectomy and microdiscectomy, although her weight does predispose us to several complications.  I did explain to her that due to the fact that she is overweight, it makes the operation much more complicated.  We may have difficulty obtaining an adequate x-ray for localization for the operation.  It may also be quite difficult to remove the extruded disc due to her girth.  With that said, I did explain to her that I am willing to go ahead and proceed with the surgery as long as she understands all the risk [sic] of the operation.  At this time, she does not wish to proceed with surgery and would like to first return to pain management to undergo injections and other conservative modalities.

(R. 351.)  Dr. Camici also indicated that plaintiff reported minimal relief with physical therapy and epidural injections.  (R. 349.)

The record reveals that the ALJ relied upon his mistaken belief that plaintiff received only conservative treatment for her back impairment and was not a surgical candidate when he found that plaintiff's back impairment was not disabling.  As such, this court recommends that this case be remanded for proper consideration of plaintiff's physical limitations and what, if any effect, these limitations have on her ability to perform work.

**B.    ALJ's Evaluation of Plaintiff's Obesity**

Plaintiff further avers that the ALJ failed to conduct the analysis required by Social Security Rule 02-1p ("SSR 02-1p") since he did not adequately consider plaintiff's obesity as a factor contributing to her physical and exertional impairments.[12]  (Pl.'s Br. at 23-24, Pl.'s Rep. at 4-5.)  SSR 02-1p sets forth guidance for evaluating obesity in a social security claim.  SSR 02-1p states that "[o]besity is a risk factor that increases an individual's chances of developing impairments in most body systems."  As there is no specific level of weight or body-mass index that equates with a "severe" or "non-severe" impairment, the ALJ must perform an

---

[12]    This court notes the medical records reflect that plaintiff's weight ranged from a low of 332 pounds to a high of 408.  (R. 130, 497, 593, 604.)

"individualized assessment of the impact of the obesity on an individual's functioning."  Id. at

*4.  An individual with obesity may satisfy step three of the sequential analysis if obesity

increases the severity of a coexisting impairment to the extent that the combination of

impairments meets or equals the requirements of the listing.  Id. at *5.  As "[o]besity in

combination with another impairment may or may not increase the severity or functional

limitations of the other impairment," it is necessary to evaluate each case based on the

information in the case record.  Id. at *6.

Social security regulations are clear that an ALJ must consider obesity as a factor

in a disability determination.  See SSR 02-1p.  However, where a claimant makes a generalized

claim that obesity increases her impairments, without any medical evidence specifying how or in

what way it does so, remand is not required.  Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir.

2005).

In this case, the ALJ assessed plaintiff's obesity as follows:

The claimant's obesity has been considered, pursuant to Social Security Ruling
02-01p.  Treatment records from May 2005 state that the claimant weighed 333
pounds (Exhibit B37F).  In June 2005, she had a gynecological evaluation for
irregular menses and pelvic pain.  She had a normal CBC, endometrial biopsy,
and Pap smear.  Because of her obesity, she was given a higher dosage of Depo-
Provera, a contraceptive (Exhibit B37F).  In June 2006, she told her psychiatrist
that her physician advised her to consider gastric bypass surgery (Exhibit B40F).
The claimant's obesity contributes to her back pain, and depression, but the
evidence, as a whole, shows that these conditions are manageable with
conservative treatment and medication.  Her treatment records from June 2006
note that her back pain has been well-controlled, with her medication (Exhibit
B42F).

(R. 23.)  As set forth above, the ALJ failed to properly consider medical evidence relating to

plaintiff's back impairment.  He erroneously concluded that plaintiff was not a surgical candidate

and as a result found that plaintiff received only conservative treatment for this ailment.  In fact, plaintiff's obesity posed a significant risk to surgery as Dr. Camici reported.  As such, this court recommends that upon remand, the ALJ reconsider plaintiff's obesity in conjunction with her other physical impairments.

### C.   ALJ's Assessment of Plaintiff's Credibility

Plaintiff contends that the ALJ's finding that plaintiff's allegations regarding her limitations are not totally credible is not supported by substantial evidence.  (Pl.'s Br. at 25-30; Pl.'s Rep. 5-6.)  The ALJ is directed by social security regulations to engage in a two-step process when considering plaintiff's subjective complaints.  In general, 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide that "[i]n determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  Social Security Ruling 96-7p further directs that in "determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  "Once an ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, he . . . must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

It is within the province of the ALJ to evaluate the credibility of a claimant.  Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  An ALJ's "findings on the credibility of

16

claimants 'are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" Irelan v. Barnhart, 243 F. Supp. 2d 268, 284 (E.D. Pa. 2003) (citing Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)).  An ALJ may disregard subjective complaints when contrary evidence exists in the record.  Mason, 994 F.2d at 1067-68.  The ALJ must, however, provide his or her reasons for doing so.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000); Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990) (noting that ALJ may reject claim of disabling pain where he has considered subjective complaints and specified reasons for rejecting claim).

As noted above, the ALJ failed to consider medical evidence of plaintiff's mental and physical limitations which clearly corroborates plaintiff's complaints.  Accordingly, this court recommends that upon remand, the ALJ should reevaluate plaintiff's credibility in light of the foregoing discussion regarding the omissions in the ALJ's opinion.

**V.**     **CONCLUSION**

After a careful and thorough review of all of the evidence in the record, this court concludes that there is not substantial evidence to support the ALJ's decision denying plaintiff benefits.  Thus, this court recommends that plaintiff's Request for Review be granted and that the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) to further develop the record in accordance with this Report and Recommendation.

**R E C O M M E N D A T I O N**

AND NOW, this 28th day of May, 2009, upon consideration of plaintiff's Brief and Statement of Issues in Support of Request for Review, defendant's Response thereto, and plaintiff's Reply, it is respectfully recommended that plaintiff's Request for Review be

GRANTED, and this case be REMANDED for further proceedings consistent with this Report

and Recommendation.[13]

BY THE COURT:


/s/ Thomas J. Rueter
THOMAS J. RUETER
Chief United States Magistrate Judge

---

[13]      Since the court recommends a remand pursuant to sentence four of 42 U.S.C. §
405(g), the court recommends that judgment be entered in plaintiff's favor.  See Shalala v.
Schaefer, 509 U.S. 292, 296-97 (1993) (Sentence four of 42 U.S.C. § 405(g) authorizes a district
court to enter a judgment "with or without" a remand order, not a remand order "with or without"
a judgment.).  See also Kadelski v. Sullivan, 30 F.3d 399, 401 (3d Cir. 1994).
          Plaintiff requests that the decision of the ALJ be reversed, and that the court
award plaintiff benefits.  (Pl.'s Br. at 30.)  This court recommends that plaintiff's request be
granted only insofar as plaintiff requests a reversal of the decision of the ALJ.  A "court should
direct a verdict for the plaintiff as opposed to remand 'only when the administrative record of the
case has been fully developed and when substantial evidence on the record as a whole indicates
that the plaintiff is disabled and entitled to benefits.'"  Bailey v. Apfel, 2001 WL 722787, at *4
(E.D. Pa. June 26, 2001) (citing Podedworny v. Harris, 745 F.2d 210, 221-22 (3d Cir. 1984)).  As
heretofore explained the record is not fully developed in this case since the ALJ failed to evaluate
evidence relevant to plaintiff's impairments and the impact of this evidence on her ability to
perform work.  Thus, this court recommends remand, not reversal.